IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

_____

THE WRIGHT JEWELERS, INC.,

    Plaintiff,

Vs.                           No. 02A01-9409-CV-00202
                                   Shelby Circuit No. 44751

FIREMAN'S FUND INSURANCE
COMPANY d/b/a THE AMERICAN
INSURANCE COMPANY,

    Defendant.

FILED

**November 8, 1995**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

FROM THE CIRCUIT COURT OF TENNESSEE FOR THE THIRTIETH
JUDICIAL DISTRICT AT MEMPHIS

THE HONORABLE JANICE M. HOLDER, JUDGE


Sam L. Crain, Jr.
BURCH, PORTER & JOHNSON, Memphis,
For Plaintiff-Appellant

Robert D. Flynn
SPICER, NORCROSS, FLYNN & RUDSTROM, Memphis,
For Defendant-Appellee


*AFFIRMED*

Opinion filed:


W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.

CONCUR:

ALAN E. HIGHERS, JUDGE

PAUL G. SUMMERS, JUDGE

This is a declaratory judgment action to determine coverage under an insurance policy. Plaintiff, Wright Jewelers, Inc., appeals from the order of the trial court denying its motion for summary judgment and granting summary judgment to defendant, Firemen's Fund Insurance Company, d/b/a The American Insurance Company.

By written stipulation of the parties, the undisputed facts are as follows:

1. Fireman's Fund Insurance Company, d/b/a The American Insurance Company ("Fireman's Fund"), issued a "Jewelers Block Policy" bearing No. 2-59-MJB 616 00 13 to Wright Jewelers with coverage dates of 11-1-90 to 11-1-91.

2. In addition to the aforementioned policy issued by Fireman's Fund, Wright also had a separate policy of insurance captioned "SafeCo Protection Plan Business Policy" bearing No. CP9021198A with coverage dates of 11-1-90 to 11-1-91 with SafeCo Insurance Company of America ("SafeCo").

3. The parties stipulate to the authenticity and admissibility of the aforementioned policies of insurance.

4. At all relevant times Bruce Harrington was the President and a shareholder of The Wright Jewelers, Inc. ("Wright").

5. At all relevant times Libby Wright ("Ms. Wright") was the General Manager of Wright.

6. At all relevant times Holly Heine ("Ms. Heine") was the Assistant Manager of Wright.

7. At all relevant times Dorothy Poole was employed by Wright as an Appraiser.

8. At all relevant times Wright was engaged in the business of selling jewelry, including consignment sales of jewelry entrusted to it by others.

9. On July 17, 1991, Olivia Dowell ("Mrs. Dowell") took her emerald-cut diamond ring to Wright.

10. Mrs. Dowell told Ms. Wright that she was interested

2

in selling the ring and she wanted to have it valued for that purpose.

11. Mrs. Dowell left the ring with Wright, and she authorized Ms. Wright to take the ring to New York City so she could show it to dealers there.

12. The ring was taken to Wright by Mrs. Dowell for the express purpose of being sold.

13. Ms. Wright took the ring to New York, where she showed it to Greg Herdemian ("Mr. Herdemian"), who was the Manger of Empire Diamond Corporation ("Empire").

14. Empire is a jewelry merchant which deals in jewelry of the kind shown to Mr. Herdemian by Ms. Wright, and Empire is in the business of selling jewelry, including jewelry delivered to it for consignment sale.

15. Mr. Herdemian told Ms. Wright that Empire would purchase the ring outright for a cash price of $50,000.00 or take the ring on a consignment basis and try to sell it for $60,000.00.

16. Mr. Herdemian gave Ms. Wright his business card on the back of which he wrote the price for which he would try to sell the ring if Empire took it on consignment ($60,000.00) and the cash price for which Empire would purchase the ring outright ($50,000.00).

17. A true, accurate and authentic copy of Mr. Herdemian's business card is attached to these stipulations and is admitted into evidence in place of the original without further proof.

18. After showing the ring to Mr. Herdemian, Ms. Wright returned to Memphis with the ring.

19. After obtaining Mrs. Dowel's permission to attempt to sell the ring, Ms. Wright sent the ring to Mr. Herdemian at Empire via Loomis with a packing slip to which Ms. Wright affixed the business card containing the price range Mr. Herdemian had given Ms. Wright on the ring.

20. Mr. Herdemian received the ring and the business card, and he considered Empire's receipt of the ring to be Empire's permission to sell the ring within the price range contained on his business card.

21. Both Wright and Empire implicitly understood that

3

Empire had authority to sell the ring on behalf of the Dowells within the price range earlier quoted by Empire.

22. Ms. Heine, an employee and agent of Wright, called Empire to confirm the proposed sales price for the ring.

23. Following delivery of the ring to Empire for purposes of sale, Ms. Heine, acting for and on behalf of Wright, confirmed with Jack Dowell ("Mr. Dowell") that Wright and Empire had permission to sell the ring.

24. Mr. Dowell, by telephone conversation with Ms. Heine in approximately August, 1991, expressly confirmed once again that Wright and Empire had Mrs. Dowell's permission to sell the ring.

25. Ms. Heine, acting upon the verbal permission and authorization of Mr. Dowell, told Empire that Wright's clients had given Wright permission to sell the ring.

26. At all relevant times Mr. Dowell was acting as the authorized agent of his wife, Mrs. Dowell, and he had the authority to communicate with Wright on Mrs. Dowell's behalf.

27. Empire was expressly authorized by Mrs. Dowell, through Wright, to sell the ring.

28. Mr. Herdemian, acting in his capacity as Empire's Manager, thereafter sold the ring at retail to an individual.

29. The ring was sold by Empire for its actual fair market value.

30. The actual faire market value of the ring of [sic] the time and place of sale was between $45,000.00 and $52,000.00.

31. Empire sold the ring with the express consent and permission of Ms. Dowell and with the knowledge of Wright.

32. Both prior and subsequent to the sale of the ring Wright told the Dowells that it would reduce the commission that it would earn on Empire's sale of the ring because the Dowells were apparently unhappy with the progress or result of the transaction.

33. Ms. Heine, on behalf of Wright, informed Mr.

4

Dowell of Wrights' reduction in its sales commission.

34. Shortly after Empire sold the ring to the individual, Ms. Heine telephone Mr. Herdemian and told him that Wright's client had changed her mind and did not want to sell the ring; Ms. Heine asked Mr. Herdemian to try to get the ring back.

35. Mr. Herdemian contacted the individual to see if he would return the ring, but the individual refused.

36. When Ms. Wright sent the ring to Empire, and while Empire had the ring on consignment, Mrs. Dowell was the owner of the ring.

37. At all relevant times Empire had possession of the ring on a consignment basis.

38. Neither Empire nor Mr. Herdemian received any compensation, in the form of a commission or otherwise, from Wright.

39. Subsequent to the sale of the ring by Empire, Wright invoiced Empire for the portion of the sales price to be remitted to Wright ($50,000.00).

40. A true, accurate and authentic copy of the invoice dated 10/1/91 from Wright to Mr. Irving Brod of Empire is attached to these Stipulations and is admitted into evidence in place of the original without further proof.

41. On or about October 1, 1991, Empire remitted to Wright the sum of $50,000.00.

42. The ring was not damaged by either Wright or Empire.

43. The ring was not misplaced or mislaid by either Wright or Empire.

44. At all relevant times Empire was not a commission salesman or selling agent on the payroll or in the direct or indirect employ of Wright.

45. Wright's policy of insurance with Fireman's Fund provides for a deductible of $1,000.00.

46. After Mr. and Mrs. Dowell filed suit against Wright, Wright sent written demand to Fireman's Fund and SafeCo requesting that each provide Wright with a defense to, and coverage for, the lawsuit.

47. Both Fireman's Fund and SafeCo denied coverage and refused to provide Wright with a defense.

48. Wright filed this declaratory judgment action against Fireman's Fund and SafeCo seeking a ruling from the court that either or both insurance companies were obligated to provide Wright with a defense and with coverage for any judgment entered against Wright in the underlying lawsuit.

49. Both companies filed answers denying the duty to defend Wright or provide it with coverage under their respective policies.

50. Wright ultimately settled with SafeCo for a lump sum payment from SafeCo of $5,000.00.

51. SafeCo prepared, and Wright executed, a document entitled "Full Release and Settlement of All Claims" ("Release").

52. A true, accurate and authentic copy of the Release is attached to these stipulations and is admitted into evidence without further proof.

Wright's complaint seeks a declaratory judgment that Firemen's Fund is liable for the amount of any judgment obtained by the Dowells against Wright. Wright also alleges that the policy required Firemen's Fund to provide Wright a defense to the Dowell suit and that since Fireman's refused to provide a defense, Fireman's is required to reimburse Wright to the costs incurred in defending the suit. Wright relies upon the following policy provisions:

JEWELERS' BLOCK POLICY FORM -
CM 00 59 08 83
Commercial Inland Marine Coverage Form

Part C - Property Insured

The Property Insured Is As Follows:

1. Pearls, precious and semi-precious stones, jewels, jewelry, watches and watch movements, gold, silver, platinum, other precious metals, and alloys and other stock usual to the conduct of the Insured's business, owned by the Insured;

2. Property as described above delivered or entrusted

6

to the Insured by others who are not dealers in such property or otherwise engaged in the jewelry trade;

*       *       *

Part E - Insuring Conditions

1. This policy insures against all risks of loss of or damage to the above described property arising from any cause whatsoever except: [No exceptions are applicable.]

*       *       *

6. In the event of loss of or damage to property of others held by the Insured for which claim is made upon the Company, the right to adjust such loss or damage with the owner or owners of the property is reserved to the Company and the receipt of such owner or owners in satisfaction thereof shall be in full satisfaction of any claim of the Insured for which such payment has been made. If legal proceedings be taken to enforce a claim against the Insured as respects any such loss for damage, the Company reserves the right at its option without expense to the Insured, to conduct and control the defense on behalf of and in the name of the Insured. No action of the Company in such regard shall increase the liability of the Company under this policy; nor increase the limits of liability specified in the policy.

Wright Jewelers, relying upon the definition of loss approved in *R.T.E. Corp. v. Maryland Cas. Co.*, 247 N.W.2d 171 (Wisc. 1976), asserts that the ring was "placed beyond recovery," and, therefore, is lost. Wright argues that "[t]he ring was entrusted to plaintiff by the Dowells, and plaintiff, in turn, entrusted the ring to Empire on their behalf. The ring cannot be recovered by plaintiff, and, therefore, it is lost."

We do not disagree that the ring was placed beyond Wright's recovery when Empire sold the ring to a buyer in the ordinary course of business. *See* T.C.A. § 47-2-403(2) (1992)("Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business"). However, Wright is

7

overlooking the uncontroverted proof by stipulation that "Empire sold the ring with the express consent and permission of Ms. Dowell and with the knowledge of Wright." (Emphasis added.).

The policy provision insures "against all risks of loss of . . . the above described property . . . ." Thus, giving the language its usual and ordinary meaning, the policy provides coverage for lost property. <u>Black's Law Dictionary</u> (6th ed. 1979) defines "lost" as:

> An article is "lost" when the owner has lost the possession or custody of it involuntarily and by any means, but more particularly by accident or his own negligence or forgetfulness, and when he is ignorant of its whereabouts or cannot recover it by an ordinary diligent search.

The same dictionary also defines "lost property" as:

> Property which the owner has involuntarily parted with and does not know where to find or recover it, not including property which he has intentionally concealed or deposited in a secret place for safe-keeping. Distinguishable from mislaid property which has been deliberately placed somewhere and forgotten.

The policy in this case provides the insured payment for lost property, which is generally understood to be property which has been parted with involuntarily. Therefore, in our opinion, the voluntary conveyance and sale of the ring do not constitute a "loss" under the policy in question. It is difficult to conceive of an insurance policy which would include within the definition of lost property, property that is voluntarily conveyed by the owner, thereby placing the property beyond the owner's recovery. To allow an insured to claim a loss whenever insured property is "placed beyond recovery," without regard to whether the insured acted voluntarily, could allow an insured a recovery in a number of fraudulent or potentially fraudulent situations.

In the absence of fraud or mistake, a contract must be interpreted and

8

enforced as written, and in construing the contract, the words expressing the parties' intention should be given their usual, natural and ordinary meaning. *Ballard v. North American Life & Cas.*, 667 S.W.2d 79 (Tenn. App. 1983). Giving the words used in the contract before us their ordinary and usual meaning, we find that it was the intention of the parties that the insurance policy would cover lost property. The property in this case was not lost, but was voluntarily conveyed.

Wright also argues that Fireman's Fund is obligated by the policy provisions to defend the action filed by the Dowells. We must respectfully disagree. There is no contract provision requiring Fireman's Fund to defend. The policy clearly and unambiguously states that Fireman's Fund has the option to defend; therefore, this argument is without merit.

The order of the trial court granting summary judgment is affirmed. Costs of the appeal are assessed against the appellant.

_____
W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.

CONCUR:


_____
ALAN E. HIGHERS, JUDGE


_____
PAUL G. SUMMERS, JUDGE